**No. 25-40368**

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA, EX REL,
JACK JAY PALMER, JR., ON BEHALF OF THE UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

*v.*

TATA CONSULTING SERVICES,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Eastern District of Texas, Sherman Division,
Civil Action No. 4:17-cv-00072-ALM
Honorable Amos L. Mazzant, III, Presiding

**BRIEF OF APPELLANT**

Mark D. Cronenwett
Texas Bar No. 00787303
Lewis Brisbois Bisgaard & Smith, LLP
mark.cronenwett@lewisbrisbois.com
2100 Ross Ave., Ste. 2000
Dallas, TX 75202
(214) 722-7100 – Phone
(214) 722-7111 – Fax

Counsel for Appellant Jack "Jay" Palmer

*Oral Argument Requested*

## CERTIFICATE OF INTERESTED PERSONS

**(A)    Style and Number of the Case:**

United States of America, Ex Rel, Jack "Jay" Palmer, Jr. v. Tata Consulting Services, Appeal No. 25-40368.

**(B)    Parties:**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Jack "Jay" Palmer, on behalf of the United States of America
Appellant

Counsel for Appellant:
Mark D. Cronenwett
Texas Bar No. 00787303
Lewis Brisbois Bisgaard & Smith, LLP
2100 Ross Ave., Ste. 2000
Dallas, TX 75202
(214) 722-7100
mark.cronenwett@lewisbrisbois.com

Tata Consultancy Services, Ltd. ("TCS")
Appellee

Counsel for Appellee:
Howard Shapiro
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
212-295-6706
howard.shapiro@wilmerhale.com

i

Daniel Volchok
Wilmer Cutler Pickering Hale & Dorr, L.L.P.
2100 Pennsylvania Avenue, N.W.
Washington, DC 20037
202-663-6103
daniel.volchok@wilmerhale.com

Lauren Moore
Wilmer Cutler Pickering Hale & Dorr, L.L.P.
2100 Pennsylvania Avenue, N.W.
Washington, DC 20037
202-663-6160
lauren.moore@wilmerhale.com

Melissa Richards Smith
Gillam & Smith, LLP
303 South Washington Avenue
Marshall, TX 75670
903-934-8450
melissa@gillamsmithlaw.com.

Intervenors and *Amici*

Appellant is not aware of any intervenors or *amici* in this matter.

/s/*Mark D. Cronenwett*
Mark D. Cronenwett

ii

## CERTIFICATE AS TO RULINGS AND RELATED CASES

### A. Rulings Under Review

The ruling under review in this proceeding is Judge Amos L. Mazzant's May 21, 2025 Opinion and Order granting Appellee's motion to dismiss in the U.S. District Court for the Eastern District of Texas. The Opinion and Order can be found in the Record on Appeal ("ROA") at ROA.232, 258 and Record Excerpt ("RE") at Tab 4, RE-9; RE at Tab 3, RE-9, respectively. No official citation for the Opinion or Order exists.

### B. Related Cases.

1. This case has not previously been before this Court or any other court.

2. There are no related cases currently pending appeal known to Appellants at this time. Appeals also challenging the interpretation of the reverse false claims provision of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), based on similar facts were recently decided:

- Case No. 22-1854, *United States ex rel. Billington v. HCL Technologies Ltd.* (2d Cir.).

- Case No. 24-7032, *United States ex rel. Kini v. Tata Consultancy Services, Ltd.* (D.C. Cir.)

*/s/Mark D. Cronenwett*
Mark D. Cronenwett

iii

**STATEMENT REGARDING ORAL ARGUMENT**

Plaintiff-Appellant Jack "Jay" Palmer ("Palmer") requests oral argument as he believes it could significantly aid the decisional process in this case. Particularly, Palmer seeks oral argument in order to explain why *Billington* and *Kini* were incorrectly decided and why defendant-appellee and the district court's "two wrongs make a right" logic justifies defendant-appellee's continued abuse of the United States' visa application process to the detriment of the United States Government and the American taxpayer.

**TABLE OF CONTENTS**

Statement of Jurisdiction..................................................................................................1

Statement of Issues.........................................................................................................1

Statement of the Case.....................................................................................................2

Summary of the Argument.............................................................................................10

Argument........................................................................................................................11

I.    Palmer Adequately Alleged TCS Had an FCA "Obligation" to Pay the Government Higher Withholding Taxes and  H-1B Visa Application Fees....................................................................................................................12

    A.    TCS Had a Duty to Pay Higher Withholding Taxes for H-1B Visa Workers Pursuant to 20 C.F.R. § 655.731's Wage Requirement…………………………………………………...13

        1.  TCS's Duty to Pay Higher Withholding Taxes Arose from Regulation (20 C.F.R. § 655.731), or from a Contractual or Implied Contractual Relationship……………………………14

        2.  The District Court Erred in Finding the Obligation Impermissibly Contingent or Owed Only to Employees………..16

    B.    TCS Had a Duty to Pay H-1B Visa Application Fees Where TCS Obtained the Benefit of H-1B Visas, and Regulations Require Applying for the Appropriate Visa………………………………20

        1.  TCS Had a Duty to Pay H-1B Application Fees Arising from Regulation, a Fee-Based Relationship, or a Contractual Relationship, or a Contractual Relationship with the Government…………………………………………………..21

        2.  The *Franchitti* Court Correctly Addressed the Same Issue, Relying on *Victaulic* and *Pemco*…………………………….28

3.  Visa Application Fees Are User Fees, Not Contingent
    Penalties…………………………………………………...…..35

4.  The *Lesnik* Decision Relied on an Abrogated Holding and
    Inapplicable Concessions………………….………………….37

Conclusion………………………………………...………………………39

# TABLE OF AUTHORITIES

**Cases**                                                                                                **Page(s)**

*Am. Textile Mfrs. Inst., Inc. v. Limited, Inc.*,
190 F.3d 729 (6th Cir. 1999) ............................................................26, 32, 37, 38

*U.S. ex rel. Bahrani v. Conagra, Inc.*,
465 F.3d 1189 (10th Cir. 2006) .............................................................*passim*

*United States ex rel. Billington v. HCL Technologies Ltd.*,
No. 3:19CV01185, 2022 U.S. Dist. LEXIS 134048 (D. Conn. July
28, 2022) ............................................................................................19, 20

*United States ex rel. Billington v. HCL Techs. Ltd.*,
126 F.4th 799 (2d Cir. 2021) ...................................................................19

*U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*,
839 F.3d 242 (3d Cir. 2016) ..................................................................*passim*

*Domain Vault LLC v. McNair*,
Civil Action No. 3:14-CV-1126-L, 2015 U.S. Dist. LEXIS 130449
(N.D. Tex. Sep. 28, 2015) ..........................................................................4

*Dorsey v. Portfolio Equities, Inc.*,
540 F.3d 333 (5th Cir. 2008) ....................................................................12

*Franchitti v. Cognizant Tech. Sols. Corp.*,
555 F.Supp.3d 63 (D.N.J. 2021) ............................................................*passim*

*Franchitti v. Cognizant Tech. Sols. Corp.*,
No. 3:17-cv-06317, 2023 U.S. Dist. LEXIS 144061 (D.N.J. Aug.
16, 2023) ...............................................................................................19

*Franchitti v. Cognizant Tech. Sols.*,
No. 3:17-cv-06317, 2022 U.S. Dist. LEXIS 35486 (D.N.J. Mar. 1,
2022) ................................................................................................*passim*

*United States ex rel. Frey v. Health Mgmt. Sys.*,
2021 U.S. Dist. LEXIS 189408 (N.D. Tex. Oct. 1, 2021)...........................17, 18

*Funk v. Stryker Corp.*,
631 F.3d 777 (5th Cir. 2011) .....................................................................4

*U.S. ex rel. Hunt v. Merck-Medco Managed Care, L.L.C.*,
 336 F.Supp.2d 430 (E.D. Pa. 2004) ........................................................19

*U.S. ex rel. Kane v. Healthfirst, Inc.*,
 120 F.Supp.3d 370 (S.D.N.Y. 2015) .......................................................26

*Lesnik v. Eisenmann SE*,
 374 F.Supp.3d 923 (N.D. Cal. 2019) ...............................11, 37, 38, 39

*U.S. ex rel. Schaengold v. Mem'l Health, Inc.*,
 No. 4:11-cv-58, 2014 U.S. Dist. LEXIS 169555 (S.D. Ga. Dec. 8,
 2014) ......................................................................................................14, 15

*United States v. Bourseau*,
 531 F.3d 1159 (9th Cir. 2008) ...............................................................26

*United States v. Pemco Aeroplex, Inc.*,
 195 F.3d 1234 (11th Cir. 1999) (en banc) ...................................*passim*

*United States v. Q Int'l Courier*,
 131 F.3d 770 (8th Cir. 1997) ..................................................................26

**Statutes**

8 C.F.R. § 103.2(a)(1) ...............................................................................27, 35

8 C.F.R. §§ 106.1, 106.2, 214.2(h)(2)(i)(A) ..................................................26

8 C.F.R. § 106.1(a) ......................................................................................9, 23, 37

8 C.F.R. § 106.2 .............................................................................................9, 23

8 C.F.R. § 106.2(a)(3)(i), (vi) .........................................................................22

8 C.F.R. § 106.2(c)(11) ................................................................................9, 35

8 C.F.R. § 214.2(b) ..........................................................................................24

8 C.F.R. § 214.2(h)(1)(ii)(B) ..........................................................................22

8 C.F.R. § 214.2(h)(2)(i)(A) .......................................................................22, 27

8 C.F.R. § 214.2(h)(2)(i)(E) ......................................................................11, 24, 37

8 C.F.R. §§ 214.2(h)(2)(i)(E), (*l*)(7)(i)(C) ........................................................27, 34, 37

8 C.F.R. § 214.2(h)(2)(i)(E), (*l*)(7)(C) ...................................................................8

8 C.F.R. § 214.2(h)(4) .............................................................................................22

8 C.F.R. § 214.2(*l*)(1)(i), (ii). B-1 ........................................................................23

8 C.F.R. § 214.2(*l*)(1)(ii)(D) ..................................................................................6

8 C.F.R. § 214.2(*l*)(7)(i)(C) ...........................................................................24, 37

8 U.S.C. 1184(c)(9)(A), (11)(A) ...........................................................................36

8 U.S.C. § 1101(a)(15)(B) ......................................................................................23

8 U.S.C. § 1101(a)(15)(H)(i)(b) .............................................................................22

8 U.S.C. § 1101(a)(15)(L) ......................................................................................23

8 U.S.C. § 1182(n)(1)(A)(i) ....................................................................................27

8 U.S.C. § 1182(n)(2)(A) ........................................................................................19

8 U.S.C. § 1182(t)(1) ................................................................................................4

20 C.F.R. § 655.700(b)(2). L-1 ...........................................................................9, 22

20 C.F.R. § 655.730(a) .....................................................................................22, 27

20 C.F.R. § 655.731 .....................................................................................1, 14, 15, 19

20 C.F.R. § 655.731(a) ....................................................................................*passim*

20 C.F.R. § 655.731(a), (c)(2) ................................................................................14

20 C.F.R. § 655.731(b)(1)-(3) ..................................................................................5

20 C.F.R. § 655.731(c) ............................................................................................13

20 C.F.R. § 655.731(c)(2) ................................................................................*passim*

20 C.F.R. § 655.731(c)(2)(ii)-(iv) ..........................................................................13

26 U.S.C. §§ 1, *et seq* ...............................................................................................3

26 U.S.C. §§ 3101, *et seq*................................................................3, 13, 17

26 U.S.C. § 3111(a) ...........................................................................20

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1331 .................................................................................1

28 U.S.C. § 1345 .................................................................................1

31 U.S.C. § 3729(a)(1)(G) .............................................................12, 21, 35

31 U.S.C. § 3729(b)(3).................................................................*passim*

31 U.S.C. § 3732(a) .............................................................................1

## STATEMENT OF JURISDICTION

Plaintiff-Appellant United States ex rel. Jack "Jay" Palmer brought this case under the False Claims Act, 31 U.S.C. §§ 3729-3733. The District Court, therefore, had subject matter jurisdiction over this case pursuant to 31 U.S.C. § 3732(a) (False Claims Act), 28 U.S.C. § 1345 (United States as Plaintiff), and 28 U.S.C. § 1331 (Federal Question). The district court issued a final judgment dismissing this case in its entirety with prejudice on May 21, 2025.

Palmer timely filed his Notice of Appeal on June 18, 2025. ROA.265; RE at Tab 2, RE-8; FED. R. APP. P. 4(a)(1)(A). Accordingly, this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether the district court erred in finding no reverse-False Claims Act ("FCA") "obligation" where TCS had a regulatory duty under 20 C.F.R. § 655.731 to pay the "H-1B required wage," which included payment of wages based on the actual or prevailing wage and the simultaneous payment of withholding taxes, and TCS had a contractual duty where TCS agreed in writing to comply with the regulatory H-1B wage requirement.

2. Whether the district court erred in finding no reverse-FCA "obligation" where regulations required TCS to seek H-1B visas and pay the

1

accompanying application fee for work that TCS knew required an H-1B visa, but TCS instead improperly used cheaper L-1 and B-1 visas, and TCS's duty to pay H-1B application fees arose from regulation, a fee-based relationship, and a contractual relationship.

## STATEMENT OF THE CASE

Palmer appeals from a Rule 12(b)(6) dismissal of his First Amended Complaint ("FAC"), which asserted a claim for violations of the reverse-false claims provision of the FCA. The district court, without holding oral argument, found that TCS had no FCA "obligation" to pay higher taxes or to pay H-1B visa application fees.

### *1.* **TCS Certified That It Would Comply with the H-1B Wage Requirement, Which Includes Payment of Withholding Taxes to the Government**.

TCS is an Indian multinational company that provides information technology ("IT") and consulting services to U.S. clients. ROA.56; RE at Tab 5, RE-10, ¶ 2. American corporations use TCS's IT services in lieu of maintaining in-house IT personnel. ROA.63; RE at Tab 5, RE-17, ¶¶ 19-20. TCS employs at least 29,900 workers in the United States, the vast majority (76% or more) of whom are visa workers. Tata made over $15 billion in revenue in the past fiscal year, with over 50% of that revenue from the United States. ROA.63; RE at Tab 5, RE-17, ¶ 18.

H-1B visas are intended for bringing foreign workers to the U.S. to perform services in specialty occupations when there are insufficient workers in the U.S. to perform a specific job. ROA.63; RE at Tab 5, RE-17, ¶¶ 20-21. Employment of foreign workers on H-1B visas is highly regulated. Employers are required to pay H-1B workers the higher of (1) the "actual wage" the employer pays similarly-qualified employees in similar positions, or (2) the "prevailing wage" (i.e., the wage rate paid by other employers in the geographical area for the same work). ROA.64; RE at Tab 5, RE-18, ¶ 22 (citing 20 C.F.R. § 655.731(a)).

Payments satisfy the H-1B required wage only if associated taxes are withheld and paid to the government:

> (2) "Cash wages paid," for purposes of satisfying the *H-1B required wage,* shall consist only of those payments that meet all of the following criteria:
>
>> ....
>>
>> (ii) Payments reported to the Internal Revenue Service (IRS) as the employee's earnings, *with appropriate withholding for the employee's tax paid to the IRS* (in accordance with the Internal Revenue Code of 1986, 26 U.S.C. 1, *et seq.*);
>>
>> (iii) *Payments of the tax reported and paid to the IRS as required by the Federal Insurance Contributions Act*, 26 U.S.C. 3101, *et seq.* (FICA)....

3

> (iv) Payments reported, and so documented by the employer, as the employee's earnings, with appropriate employer and employee *taxes paid to all other appropriate Federal, State, and local governments* in accordance with any other applicable law.

20 C.F.R. § 655.731(c)(2) (emphasis added).

These wage requirements prevent Americans from losing jobs to cheaper foreign workers, ensure that foreign workers receive a fair wage and are not exploited, and prevent the government from losing tax revenues. ROA.60-61, 64, 70; RE at Tab 5, RE-14, RE-18, RE-24, ¶¶ 9-10, 22-23, 37-38.

Before applying for an H-1B visa, an employer must submit to the Department of Labor ("DOL") for review and certification a Labor Condition Application ("LCA"), in which it must attest that "for the entire period of authorized employment, the required wage rate will be paid to the H-1B nonimmigrant(s)." 20 C.F.R. § 655.731(a); *accord* ROA.64; RE at Tab 5, RE-18, ¶ 22; 8 U.S.C. § 1182(t)(1). LCAs are signed under penalty of perjury. (https://flag.dol.gov/sites/default/files/2019-09/ETA_Form_9035.pdf) (LCA, DOL Form ETA-9035); *cf. Funk v. Stryker Corp., 631 F.3d 777, 783* (5th Cir. 2011) (citation omitted) (Courts may take appropriate judicial notice of publicly available documents and transcripts produced by government agencies, as they are matters of public record; *Domain Vault LLC v. McNair,* Civil Action No. 3:14-CV-1126-L, 2015 U.S. Dist. LEXIS 130449, at *6-7

(N.D. Tex. Sep. 28, 2015) ("Filings with government agencies, public records, and government documents available from an official government website or other reliable source on the Internet have been held not to be subject to reasonable dispute.")

An employer's attestation that it will pay the required wage rate for H-1B workers is a continuing obligation by the employer over the employee's entire period of authorized employment in the U.S. ROA.64; RE at Tab 5, RE-18, ¶ 22. The employer must maintain each certified LCA in its public access file, must maintain the accuracy of its certification, and must develop and maintain documentation sufficient to meet its burden of proving the validity of the wage statement contained in the LCA. 20 C.F.R. § 655.731(b)(1)-(3).

To reduce expenses, TCS mostly employs Indian citizens in the U.S. for whom it has secured visas, predominantly H-1B visas, because they are willing to accept significantly lower wages than their American counterparts. ROA.60-61, 68, 70; RE at Tab 5, RE-14-15, RE-22, RE-24, ¶¶ 9-10,11-12, 31-32, 36-37. TCS is one of the highest volume recipients of H-1B visas. ROA.68; RE at Tab 5, RE-22, ¶ 31.

For each H-1B visa, TCS expressly agrees and certifies that it will pay the H-1B worker the required wage rate (i.e., the higher of the prevailing wage rate or

actual wage paid to comparable workers, and associated withholding taxes), even though it has no intention of doing so. ROA.64, 67-69, 73; RE at Tab 5, RE-18, RE-21-23, RE-28, ¶¶ 22, 30-31, 35, 48 . TCS pays H1-B workers approximately 30% less than the prevailing or actual wage for local non-visa hires. ROA.70, ¶ 37. TCS's unlawful reduction or avoidance of its obligation to pay the required wages to H-1B workers and associated taxes to the government has deprived the government of significant tax revenue. ROA.70; RE at Tab 5, RE-24, ¶ 38.

### 2. TCS Uses L-1 and B-1 Visas for Work That Requires TCS to Apply for and Pay Application Fees for H-1B Visas.

Most of TCS's IT project work, if performed by a foreign employee in the U.S., requires an H-1B visa to be obtained on behalf of that employee. ROA.59-60, 63; RE at Tab 5, RE-13-14, RE-17, ¶¶ 8-9, 18-20. L-1 visas are intended for a narrow range of work. ROA.65; RE at Tab 5, RE-19, ¶ 26. For example, L-1A visas require that a job exists in which a prospective visa employee primarily *supervises and controls* the work of others. ROA.65 (citing 8 C.F.R. § 214.2(*l*)(1)(ii)(B)). L-1B visas are available only for positions requiring individuals with highly specialized, *uncommon* knowledge within TCS. 8 C.F.R. § 214.2(*l*)(1)(ii)(D)).

The B-1 visa is a short-term visitor visa that allows temporary entry to the U.S. for limited business purposes, such as attending a business meeting or conference, negotiating a contract, or participating in short-term training. ROA.65-66; RE at Tab 5, RE-19, ¶ 28. B-1 visa employees may not perform skilled or unskilled labor, including billable client work. ROA.65-66; RE at Tab 5, RE-19.

The government caps the number of H-1B visas at 85,000 per year and awards H-1B visas through a competitive lottery process. ROA.64; RE at Tab 5, RE-18, ¶ 23. There is no cap or lottery process for L-1 or B-1 visas, which are available year-round. ROA.70, 72; RE at Tab 5, RE-24, RE-26, ¶¶ 39, 44.

L-1 and B-1 visas are not appropriate for most of TCS's U.S. positions. ROA.71-72; RE at Tab 5, RE-25-26, ¶¶ 40, 44. TCS nonetheless applies for L-1 or B-1 visas, and pays the lower L-1 or B-1 application fee, for work requiring an H-1B visa. ROA.71-72; RE at Tab 5, RE-25-26. TCS falsifies workers' roles and qualifications on visa applications to obtain L-1 visas for employees to perform H-1B visa work. ROA.68-69; RE at Tab 5, RE-22-25, ¶¶ 31, 33-35, 39-43.

After TCS fraudulently obtains L-1 visas, it improperly places the L-1 visa employees in technical, non-managerial and/or non-specialized positions that

require H-1B visas. ROA.70, ¶ 39. TCS takes affirmative steps to mask its visa fraud from detection by U.S. Citizenship and Immigration Services ("USCIS"). ROA.67-70; RE at Tab 5, RE-22-26, ¶¶ 31-43.

TCS also uses B-1 visas to bring employees into the U.S. to perform billable client project work requiring an H-1B visa. ROA.72-73; RE at Tab 5, RE-26-27, ¶¶ 44-46. When TCS applies for B-1 visas, it falsely represents the trip's purpose. ROA.72-73, RE at Tab 5, RE-26-27.

In applying for visas, TCS attests to the accuracy of its visa petitions. ROA.60, 64-65; RE at Tab 5, RE-14, RE-18-19, ¶¶ 9, 22, 26; (https://www.uscis.gov/sites/default/files/document/forms/i-129.pdf) (requiring signature attesting to accuracy of petition on Form I-129).

Once TCS brings employees to the U.S. on L-1 or B-1 visas, it instructs them to perform work requiring H-1B visas. ROA.71-72; RE at Tab 5, RE-25-26, ¶¶ 40-44. When there are material changes in the terms or conditions of a visa worker's employment or their eligibility compared to their original approved visa petition, TCS is required to submit an amended or new visa petition and pay the associated fee. 8 C.F.R. § 214.2(h)(2)(i)(E), (l)(7)(C).

H-1B visa application fees are much higher than application fees for L-1 or B-1 visas, ROA.65-66, 72-73; RE at Tab 5, RE-19-20, RE-26-27, ¶ 25, 27-28,

43, 46, and include a $215 non-refundable registration fee paid prior to the H-1B lottery. 8 C.F.R. § 106.2(c)(11). TCS misuses L-1 and B-1 visas as cheaper substitutes for H-1B visas, and to avoid the H-1B lottery. ROA.61-62, 65, 69-70, 72-73; RE at Tab 5, RE-15-16, RE-19-20, RE-23, RE-24-26, ¶¶ 11, 13, 25-28, 35, 39-40, 43, 46.

Application fees are paid when TCS submits visa petitions to the government. For H-1B visas, after DOL certifies the LCA, TCS must submit a nonimmigrant visa petition, Form I-129, to USCIS. 20 C.F.R. § 655.700(b)(2). L-1 visa petitions also use Form I-129, while B-1 visas require Form DS-160. The application fee the employer must pay the government depends on the intended type of work (*e.g.*, H-1B, L-1, or B-1). ROA.60-61, 63-66; RE at Tab 5, RE-14-15, RE-17, RE-19, ¶¶ 9, 11-13, 21, 26, 28; 8 C.F.R. § 106.2. The applicable regulation provides that: "Fees must be submitted with any USCIS request in the amount and subject to the conditions provided in this part[,] ... The fees established in this part are *associated with the benefit*, the adjudication, or the type of request and not solely determined by the form number listed in § 106.2." 8 C.F.R. § 106.1(a) (emphasis added).

TCS is a high-volume recipient of L-1 visas. ROA.65, 70; RE at Tab 5, RE-19, RE-24, ¶ 26, 39. As a result of TCS's fraudulent applications for L-1 and B-1

9

visas, the government has lost significant revenue from H-1B visa application fees. ROA.72-73; RE at Tab 5, RE-26-27, ¶ 43, 46.

TCS's visa fraud scheme has eluded law enforcement, partly because TCS is secretive about its underpayment of H-1B visa employees and misuse of L-1 and B-1 visas. ROA.69, 71; RE at Tab 5, RE-23, RE-25, ¶¶ 33-35, 40-42.

## SUMMARY OF THE ARGUMENT

Palmer adequately alleged: an obligation to pay higher H-1B wages and taxes; an obligation to seek H-1B visas and pay H-1B application fees.

1.      TCS had a regulatory duty to pay H-1B visa workers the required wage, which included the higher of the actual or prevailing wage, and an inseparable duty to pay withholding taxes commensurate with that wage. 20 C.F.R. § 655.731(a). Because TCS was required to comply with the wage requirement as a condition of receiving H-1B visas, and because TCS explicitly agreed to the wage requirement, TCS had both a regulatory and contractual duty to pay.

Contrary to the district court's reasoning, TCS's obligation to pay higher wages and taxes was not a contingent penalty but an affirmative regulatory and contractual requirement. And TCS's duty to pay higher taxes was owed to the government, not to H-1B visa employees.

**2.**     TCS had an "obligation" to seek and pay application fees for H-1B visas. Applicable regulations and conditions contained in visa petitions required that TCS apply for H-1B visas for work that TCS knew required H-1B visas, that TCS pay appropriate visa petition fees, and that TCS accurately complete visa petitions. In addition, TCS was required to file amended or new visa petitions, with fees, if visa employees' working conditions or eligibility materially changed compared to their original visa petitions. 8 C.F.R. § 214.2(h)(2)(i)(E). TCS had a duty based on regulation, a fee-based relationship, and/or a contractual relationship to pay the fees. *Franchitti v. Cognizant Tech. Sols. Corp.*, 555 F.Supp.3d 63, 69-71 (D.N.J. 2021) (finding fee-based or implied contractual FCA obligation under almost identical facts). The district court erred in finding that visa application fees are contingent penalties rather than user fees. The district court also erred in relying on *Lesnik v. Eisenmann SE*, 374 F.Supp.3d 923 (N.D. Cal. 2019), which relied on abrogated case law, and was driven by unique concessions.

## ARGUMENT

Palmer adequately alleged: (1) an FCA "obligation" in support of his reverse-FCA claim based on (a) TCS's duty to pay higher withholding taxes as part of the H-1B wage requirement, and (b) TCS's duty to apply and pay application fees for H-1B visas where its visa employees performed work requiring H-1B visas.

The grant of a motion to dismiss under Rule 12(b)(6) for failure to state a claim is reviewed de novo, "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff[]." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (internal quotation marks and citation omitted).

### I. Palmer Adequately Alleged TCS Had an FCA "Obligation" to Pay the Government Higher Withholding Taxes and  H-1B Visa Application Fees.

The district court erroneously dismissed Palmer's reverse-FCA claims because it found that TCS had no FCA "obligation." ROA.248-256, RE at Tab 4, RE-25-33.

The reverse-false claims provision of the FCA imposes liability whenever a person: "knowingly makes, uses, or causes to be made or used, a false record or statement material to an *obligation* to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an *obligation* to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G) (emphasis added).

Here, Palmer pled reverse-FCA claims based on two "obligations": (A) TCS's duty to pay the H-1B required wage, including associated withholding taxes; and (B) TCS's duty to seek H-1B visas and pay H-1B visa application fees before seeking to have foreign workers perform work that TCS knew required an H-1B visa.

### A. TCS Had a Duty to Pay Higher Withholding Taxes for H-1B Visa Workers Pursuant to 20 C.F.R. § 655.731's Wage Requirement.

Palmer adequately alleges that TCS had an "obligation" to pay additional taxes to the government where withholding taxes are an explicit part of the regulatory H-1B wage requirements, and TCS agreed to comply with those requirements. ROA.59-60, 70 65; RE at Tab 5, RE-13-14, RE-24, ¶¶ 8, 10, 38; 20 C.F.R. § 655.731(c).

H-1B regulations required TCS to pay H-1B visa employees the higher of (1) the same actual wage amounts it pays non-visa-dependent employees; or (2) the prevailing wage. 20 C.F.R. § 655.731(a). To satisfy the regulatory wage requirements, the payments "shall" include " appropriate withholding for the employee's tax *paid to the IRS* (in accordance with the Internal Revenue Code)," "[p]ayments of the tax reported and *paid to the IRS* as required by ... [FICA]," and "employer and employee taxes *paid to all other appropriate Federal*, State, and local *governments* in accordance with any other applicable law." 20 C.F.R. § 655.731(c)(2)(ii)-(iv) (emphasis added).

When payments are made to an H-1B employee without taxes being withheld and paid to the IRS, they are not part of the H-1B wage requirement. *Id.*; *XCEL Sols. Corp.*, 2014 DOL Ad. Rev. Bd. LEXIS 52, at *17 (July 16, 2014)

13

(affirming ALJ's decision not to credit towards H-1B wage requirements payments made to employee where taxes on the payments were not withheld and paid to IRS as required by 20 C.F.R. § 655.731(c)(2)); *Ave. Dental Care*, 2010 DOL Ad. Rev. Bd. LEXIS 4, at *2021 (Jan. 7, 2010) (same); *Bedi*, 2016 DOL Ad. Rev. Bd. LEXIS 10, at *4-5 (Feb. 29, 2016) (same).

### 1. TCS's Duty to Pay Higher Withholding Taxes Arose from Regulation (20 C.F.R. § 655.731), or from a Contractual or Implied Contractual Relationship.

The duty to pay taxes based on the actual or prevailing wage satisfies the FCA's definition of "obligation" in two ways. First, a duty to pay money to the government arising from regulation is an "obligation" under the FCA. 31 U.S.C. § 3729(b)(3) ("obligation" includes "an established duty, whether or not fixed, arising ... from statute or regulation"); *U.S. ex rel. Schaengold v. Mem'l Health, Inc.*, No. 4:11-cv-58, 2014 U.S. Dist. LEXIS 169555, at *38-39 (S.D. Ga. Dec. 8, 2014) (express regulatory requirement to pay is sufficient to demonstrate existence of an obligation).

TCS had a regulatory obligation under 20 C.F.R. § 655.731 to pay higher withholding taxes based on the actual or prevailing wage. 20 C.F.R. § 655.731(a), (c)(2) (requiring payment of actual or prevailing wage and requiring that withholding taxes be paid for a payment to satisfy H-1B wage requirement).

14

Second, TCS agreed in each LCA that it would pay the H-1B required wage (which includes withholding taxes). ROA.60, 64; RE at Tab 5, RE-14, RE-18, ¶¶ 10, 23; 20 C.F.R. § 655.731 (requiring that employer "state on Form ETA 9035 or 9035E that it will pay the H-1B nonimmigrant the required wage rate"); (https://flag.dol.gov/sites/default/files/2019-09/ETA_Form_9035.pdf) (LCA, DOL Form ETA-9035, requiring signature signifying agreement to wage requirement) (citing 20 C.F.R. § 655.731). This created a contractual or quasi-contractual "obligation." 31 U.S.C. § 3729(b)(3) ("obligation" includes duty arising from an "express or implied contractual ... relationship" with the government).

A quasi-contractual relationship also exists where, as here, a defendant owes money to the government in return for receiving a benefit from the government, such as by regulation. *Franchitti v. Cognizant Tech. Sols. Corp.*, 555 F.Supp.3d 63, 71 (D. NJ 2021) (finding "obligation to pay the appropriate fee for the privileges associated with its desired visa," which "could be characterized as an 'implied contractual' or 'fee-based' relationship under [Section] 3729(b)(3)"); *Schaengold*, 2014 U.S. Dist. LEXIS 169555, at *39 ("'quasi-contractual obligations created by statute or regulation' do suffice") (quoting *Am. Textile Mfrs. Inst., Inc. v. Limited, Inc.*, 190 F.3d 729, 738 (6th Cir. 1999) ("*ATMI*")); *see also U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1201 (10th Cir. 2006) (finding meat exporter that owed regulatory fees for export

15

certificates had a sufficient relationship with the government to create an "obligation").

This case involves facts very similar to *Franchitti*, in which a relator brought reverse-FCA claims against Cognizant—one of TCS's competitors—for the same two categories of reverse-FCA obligations at issue in this case, including "underpayment of its H-1B visa workers [which] deprived the United States of significant tax revenue by reducing the required amount of its payroll tax contributions." 555 F.Supp.3d at 67; *accord* ROA70 ¶ 38. It was uncontested that Cognizant had an "obligation" to pay H-1B wages and associated taxes based on actual or prevailing wages. *Franchitti*, 555 F.Supp.3d at 69-71, 74.

### 2. The District Court Erred in Finding the Obligation Impermissibly Contingent or Owed Only to Employees.

The district court erroneously found, for two reasons, that TCS had no FCA "obligation" to pay higher wages and taxes. First, the district court found that "[TCS's] tax-related obligations were 'contingent obligations to pay the government,' which are not actionable under the FCA." ROA.256, RE at Tab 4, RE-33 (internal citations omitted). In essence, the court erroneously determined that TCS's obligation was one to employees rather than the government. ROA.256, RE at Tab 4, RE-33.

But the court did not consider 20 C.F.R. § 655.731(c)(2), which imposes an affirmative and inseparable duty to remit payroll taxes to the government based on the prevailing or actual wage, and under which an employer cannot satisfy the wage

16

requirement without paying such taxes. 20 C.F.R. § 655.731(c)(2) ("for purposes of satisfying the H-1B required wage, [wages] shall consist only of those payments that" are reported "as the employee's earnings, with appropriate employer and employee taxes paid," including FICA and income tax withholdings); *Bedi*, 2016 DOL Ad. Rev. Bd. LEXIS 10, at *45 (finding by DOL that payment made by employer to H-1B employee did not even partially satisfy wage requirement because related withholding taxes were not paid); *XCEL Sols. Corp.*, 2014 DOL Ad. Rev. Bd. LEXIS 52, at *16 & n.33 (same); *Ave. Dental Care*, 2010 DOL Ad. Rev. Bd. LEXIS 4, at *20-21 (same).

In other words, contrary to the district court's conclusion, the obligation to pay higher withholding taxes is not contingent on TCS paying higher wages to employees. Rather, the duty to pay withholding taxes corresponding to the actual or prevailing wage is an affirmative and inseparable regulatory duty. 20 C.F.R. § 655.731(c)(2).

An obligation can exist even in situations where a direct duty to pay additional funds to the government is dependent on an antecedent duty that was not carried out by the defendant. *United States ex rel. Frey v. Health Mgmt. Sys.*, 2021 U.S. Dist. LEXIS 189408, *25 (N.D. Tex. Oct. 1, 2021) ("[O]bligation turns on whether a duty to pay the Government funds exists, or only a duty not to break the law.") In *Frey*, the relator brought a reverse-FCA claim against a provider of third-party liability services to state Medicaid agencies. *Id.* at *2. Under Medicaid regulations, state agencies have an obligation to pay the federal government a portion of reimbursements they receive from

third-party insurers, *id.* at \*23, and an antecedent duty to timely seek reimbursement from those insurers. *Id.* at \*2-4, 25. The relator alleged that the defendant had knowingly and wrongfully reduced an FCA obligation by failing to timely bill TPL claims, thereby reducing the amount of reimbursements collected from insurers, which in turn reduced the government's share of reimbursements. *Id.* at \*2-4. Just as TCS argued that it owed withholding taxes only on the wages it actually paid H-1B workers, the *Frey* defendant argued that its duty to pay the government portions of TPL reimbursements extended only to reimbursements that it actually received. *Id.* at \*24. The court rejected this argument because "federal statute and regulations impose[d] a duty upon the Defendant to seek reimbursement from third parties[,]" *id.* at \*25, and "failure to bill liable third parties does not allow Defendant to avoid this obligation to collect and remit payments to state Medicaid agencies, who in turn must reimburse the Government." *Id.*

Similarly, TCS's failure to comply with its antecedent duty to pay actual or prevailing wages to H-1B employees does not allow TCS to avoid its obligation to pay withholding taxes based on actual or prevailing wages. *See id.*

As referenced above, the district court found that TCS owed higher wages to employees, not the government. ROA.256; RE at Tab 4, RE-33. But the higher withholding taxes were owed to the government. 20 C.F.R. § 655.731(c)(2). And the "required wage" obligation was owed to the government, even if employees were

third-party beneficiaries, as the wage requirements are set by government regulation, 20 C.F.R. § 655.731, the government has the right to enforce the wage requirements, 8 U.S.C. § 1182(n)(2)(A), and TCS entered into a contractual or quasi-contractual relationship with the government by agreeing to comply with the wage requirements. ROA.64; RE at Tab 5, RE-18, ¶ 22; 20 C.F.R. § 655.731(a) (requiring attestation of compliance with the wage requirement); (https://flag.dol.gov/sites/default/files/2019-09/ETA_Form_9035.pdf) (same requirement in LCA, DOL Form ETA-9035).

Further, the FCA does not require that any obligation be owed directly to the government, but applies whenever the defendant's "actions had the predictable consequence of depriving the Government of money it was owed[.]" *U.S. ex rel. Hunt v. Merck-Medco Managed Care, L.L.C.*, 336 F.Supp.2d 430, 444 (E.D. Pa. 2004) (rejecting argument "that obligation [must] be owed directly to the Government").

A motion to dismiss a similar claim was granted by an out-of-circuit district court in *United States ex rel. Billington v. HCL Technologies Ltd.*, No. 3:19CV01185, 2022 U.S. Dist. LEXIS 134048 (D. Conn. July 28, 2022), and was affirmed by the Second Circuit. *United States ex rel. Billington v. HCL Techs. Ltd.*, 126 F.4th 799, 801 (2d Cir. 2021) . The *Billington* decision "focuse[d] on the theory that the FCA is not an all-purpose anti-fraud statute, or a vehicle for punishing a garden-variety breach of contract or regulatory violations." *Franchitti v. Cognizant Tech. Sols. Corp.*, No. 3:17-cv-06317, 2023 U.S. Dist. LEXIS 144061, at *2-3 (D.N.J. Aug. 16, 2023) (analyzing *Billington*).

In distinguishing *Billington*, the *Franchitti* court found that allegations almost identical to those present here "are far beyond the 'garden-variety' category." *Id.* at \*3. With respect to the obligation to pay withholding taxes, the *Billington* court relied on I.R.C. § 3111(a) in finding that there was no duty to pay federal payroll taxes on higher wages than those actually paid to employees. *Billington*, 2022 U.S. Dist. LEXIS 134048, at \*28. But the obligation to pay withholding taxes to satisfy the H-1B wage requirement is created by 20 C.F.R. § 655.731(c)(2), not I.R.C. § 3111(a), and the *Billington* court (like the district court here) did not consider or address 20 C.F.R. § 655.731(c)(2). *Id.* Moreover, the *Billington* court ignored the fixed duty to pay the higher wages. *Id.*

### B. TCS Had a Duty to Pay H-1B Visa Application Fees Where TCS Obtained the Benefit of H-1B Visas, and Regulations Require Applying for the Appropriate Visa.

Palmer adequately alleged that TCS had an FCA "obligation" to apply and pay application fees for H-1B visas where TCS applied for visas for work that TCS *knew* required H-1B visas, ROA.70-73; RE at Tab 5, RE-24-27, ¶¶ 39-46, but TCS avoided or decreased its obligation by fraudulently obtaining cheaper L1 or B-1 visas based on false statements about the nature of the work (or business purpose) for which it was seeking visa authorization, *Id.*, and after it obtained L-1 or B-1 visas, TCS instructed those visa employees to perform work that TCS knew required an H-1B visa. ROA. 70-72; RE at Tab 5, RE-24, RE-26-27, ¶¶ 39-41 ; 44-46; *see also Franchitti*, 555 F.Supp.3d at 69-71 (denying motion to dismiss nearly identical claim that defendant

had an obligation to pay H-1B visa application fees when it applied for B-1 and L-1 visas but directed those employees to perform work that required an H-1B visa).

As the court in *Franchitti* found, "[a] plain language reading of [31 U.S.C. § 3729(b)(3)] suggests that [defendant] had an obligation to pay the appropriate fee for the privileges associated with its desired visa." *Franchitti*, 555 F.Supp.3d at 71. "By paying for L-1 and B-1 visas but directing its employees to perform work that required the more expensive H-1B visa, [defendant] decreased—and made false statements material to—its obligation to pay money to the government under 31 U.S.C. § 3729(a)(1)(G)." *Id.*; *see also Franchitti v. Cognizant Tech. Sols.*, No. 3:17-cv-06317, 2022 U.S. Dist. LEXIS 35486, at *3 (D.N.J. Mar. 1, 2022) ("*Franchitti II*") ("Franch[i]tti sets forth a plausible claim by alleging that Cognizant fraudulently applied for less costly L-1 and B-1 visas where its foreign employees were required to obtain more expensive H-1B visas for the type of work they were undertaking.").

### 1. TCS Had a Duty to Pay H-1B Application Fees Arising from Regulation, a Fee-Based Relationship, or a Contractual Relationship with the Government.

TCS had an "obligation" to apply for H-1B visas and pay H-1B application fees that arose from a duty based on: (1) "statute or regulation"; (2) a "fee-based or similar relationship" with the government; or (3) "an express or implied contractual [relationship]" with the government. 31 U.S.C. § 3729(b)(3).

21

First, applicable regulations required that TCS seek H-1B visas for labor in specialty occupations, pay appropriate application fees based on the benefit sought, and file amended or new H-1B visa applications with fees when TCS instructed L-1 or B-1 visa holders to perform work requiring an H-1B visa.

"H-1B classification applies to an alien who is coming temporarily to the United States[] ... [t]o perform services in a specialty occupation." 8 C.F.R. § 214.2(h)(1)(ii)(B) (describing visa requirements); 8 U.S.C. § 1101(a)(15)(H)(i)(b) (defining H-1B nonimmigrant); 8 C.F.R. § 214.2(h)(4) (listing requirements for H-1B and defining "specialty occupation").

"An employer[ that] ... intends to employ an H-1B nonimmigrant in a specialty occupation ... *shall* submit an LCA to the Department." 20 C.F.R. § 655.730(a) (emphasis added). To obtain an H-1B visa after DOL certifies the LCA, a "United States employer seeking to classify an alien an H-1B[] ... temporary employee *must* file a petition on the form prescribed by USCIS in accordance with the form instructions." 8 C.F.R. § 214.2(h)(2)(i)(A) (emphasis added). Both H-1B and L-1 petitions require Form I-129. 20 C.F.R. § 655.700(b)(2); 8 C.F.R. § 106.2(a)(3)(i), (vi). "Each petition must be accompanied by the appropriate filing fees."

22

(https://www.uscis.gov/sites/default/files/document/forms/i-129.pdf)
(Instructions to Form I-129).

"Fees must be submitted with any USCIS request in the amount and subject to the conditions provided in this part[.] ... The fees established in this part are *associated with the benefit*, the adjudication, or the type of request and not solely determined by the form number listed in § 106.2." 8 C.F.R. § 106.1(a) (emphasis added). In turn, § 106.2 establishes the application fees for visas, including H-1B visas. 8 C.F.R. § 106.2. Because TCS obtained the *benefit* of bringing foreign workers into the U.S. to perform work that TCS knew required an H-1B visa, TCS had a regulatory duty to seek and pay application fees for H-1B visas, *id.*; 8 C.F.R. § 106.1(a), creating an FCA obligation. 31 U.S.C. § 3729(b)(3) (defining "obligation" to include duty arising from regulation). But TCS improperly avoided or decreased that obligation by fraudulently obtaining cheaper L-1 and B-1 visas instead.

L-1 visas are designed for temporary intracompany transfers of executives or managers. 8 U.S.C. § 1101(a)(15)(L); 8 C.F.R. § 214.2(*l*)(1)(i), (ii). B-1 visas are for temporary business activities such as business meetings and conventions, negotiating contracts, or training, and cannot be used for full-time employment or skilled labor. ROA. 65-66; RE at Tab 5, RE-19, ¶ 28; 8 U.S.C. § 1101(a)(15)(B);

23

8 C.F.R. § 214.2(b). The work performed by most of TCS's L-1 and B-1 visa workers required an H-1B visa. ROA.70-73; RE at Tab 5, RE-24, RE-26-27, ¶¶ 39-40, 44-46.

Even if it were initially appropriate for TCS to apply for B-1 or L-1 visas, TCS had a regulatory duty to submit an H-1B petition, *with fee*, when TCS instructed L-1 or B-1 workers to perform work that required an H-1B visa, materially changing the terms and conditions of employment compared to the original petition, and making them ineligible for L-1 or B-1 visas. 8 C.F.R. § 214.2(h)(2)(i)(E) ("petitioner *shall file* an amended or new petition, *with fee*, ... to reflect any material changes in the terms and conditions of employment ... or the alien's eligibility as specified in the original approved petition") (emphasis added); 8 C.F.R. § 214.2(*l*)(7)(i)(C) ("The petitioner *must file* an amended petition, *with fee*[] ... to reflect ... change in capacity of employment ... or any information which would affect the beneficiary's eligibility" for an L1 visa) (emphasis added); *see also Conagra,* 465 F.3d at 1202-03 ("It is the discovery that these changes are necessary that creates the obligation" to pay the regulatory fee for changes).

Second, TCS had a duty to pay appropriate visa application fees arising from the ongoing fee-based relationship between TCS and the government. Every year, TCS pays visa application fees for thousands of visa applications, including large

numbers of H-1B, L-1, and B-1 visas, in return for the benefits the government bestows in issuing those visas. ROA.63, 65, 68; RE at Tab 5, RE-17, RE-19-21, ¶¶ 20, 26, 28, 31. When TCS sought the benefit of H-1B visas, TCS had a duty to pay the H-1B application fee. *Franchitti*, 555 F.Supp.3d at 71 (holding that duty to pay H-1B rather than L-1 and B-1 visa fees "could be characterized as" a "'fee-based' relationship") (citing 31 U.S.C. § 3729(b)(3)); *Conagra*, 465 F.3d at 1202-03 (finding FCA obligation based on regulatory duty to pay user fees).

An analogous situation arose in *Conagra*. Regulations require that meat exporters have export certificates, and if the certificates contain material errors or omissions, the exporter must apply and pay a fee for replacement certificates. *Conagra*, 465 F.3d at 1192-93, 1198-99. Defendant Conagra routinely altered existing USDA export certificates instead of obtaining replacement certificates, and the issue was whether Conagra had an "obligation" to pay fees for replacement certificates even though Conagra had not applied for replacement certificates. *Id.* at 1192. The Tenth Circuit found that by virtue of the defendant's fee-based relationship with the government and the regulatory scheme, the defendant had an FCA "obligation" to obtain a replacement certificate, and to pay the fee for the certificate, when it discovered a material error or omission with the original certificate that necessitated a replacement. *Id.* at 1202-03. The *Conagra* court

25

explained that an "obligation" "need not be for a precise amount in order to be actionable," but it "must arise from a source independent of the 'allegedly fraudulent acts taken to avoid it.'" *Id.* at 1202 (quoting *U.S. ex rel. Bahrani v. Conagra Beef Cos.*, 338 F.Supp.2d 1202, 1207 (D. Colo. 2004)).

The broader interpretation of "obligation" in *Conagra* (and in *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234 (11th Cir. 1999) (en banc) and *United States v. Bourseau,* 531 F.3d 1159 (9th Cir. 2008)) conflicted with a narrower interpretation of obligation in *ATMI*, 190 F.3d 729 and *United States v. Q Int'l Courier,* 131 F.3d 770 (8th Cir. 1997). Congress enacted the Fraud Enforcement and Recovery Act of 2009 ("FERA") to resolve the circuit split created by these decisions by adding a definition of "obligation" to the FCA consistent with *Conagra* and explicitly endorsing *Conagra* and its broader interpretation. *U.S. ex rel. Kane v. Healthfirst, Inc.,* 120 F.Supp.3d 370, 388 (S.D.N.Y. 2015) (citing S. Rep. No. 111-10, at 14 & n.14 (2009)).

Consistent with *Conagra* and the FERA amendments, even though TCS did not apply for H-1B visas, TCS had an obligation because it had a fee-based and regulatory duty (as well as a contractual duty) to apply and pay application fees for H1-B visas when TCS sought visas for and sought entry to the U.S for foreigners to perform work requiring an H-1B visa, 8 C.F.R. §§ 106.1, 106.2,

26

214.2(h)(2)(i)(A); 20 C.F.R. § 655.730(a); (https://www.uscis.gov/sites/default/files/document/forms/i-129.pdf) (Form I-129 Instructions), and when TCS assigned work to its visa employees materially different from that described in their visa applications, thereby requiring amended or new visas. 8 C.F.R. §§ 214.2(h)(2)(i)(E), (*l*)(7)(i)(C).

Third, TCS had a duty to pay appropriate application fees arising from a contractual or implied contractual relationship with the government. TCS agrees in its visa applications and ongoing certifications that it is complying with visa requirements, and that its applications are true and correct. 31 U.S.C. § 3729(b)(3) (obligation under FCA can arise from "an express or implied contractual [relationship]" with the government); ROA.60, 64, 67, 69; RE at Tab 5, RE-14, RE-17-18, RE-23, ¶¶ 9, 21-22, 35; 8 U.S.C. § 1182(n)(1)(A)(i) (requiring employer to attest in LCA to compliance with H-1B wage requirements); 20 C.F.R. § 655.731(a) (same); 8 C.F.R. § 214.2(h)(2)(i)(A) ("[employer] must file a petition on the form prescribed by USCIS *in accordance with the form instructions*") (emphasis added); 8 C.F.R. § 103.2(a)(1)("Every form[] ... must be ... executed in accordance with the form instructions"); (LCA requiring attestation that the petition "is true and accurate" under penalty of perjury); (https://www.uscis.gov/sites/default/files/document/forms/i-129.pdf )

(attestation on Form I-129 that "all of the information contained in the petition[] ... and in the supporting documents, is complete, true, and correct"); ("Your electronic signature certifies that ... your answers are true and correct" on DS-160).

In addition, a contractual or implied contractual relationship arises because TCS obtains and retains the benefit of visas from the government in return for complying with regulatory and statutory visa requirements, including paying appropriate fees. *Franchitti*, 555 F.Supp.3d at 71 (holding that duty to pay H-1B rather than L-1 and B-1 visa fees "could be characterized as an 'implied contractual' ... relationship") (citing 31 U.S.C. § 3729(b)(3)); *U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 255-56 (3d Cir. 2016) (finding FCA obligation where statute and regulation required importer to provide Customs and Border Protection ("CBP") with information necessary to enable CBP to properly assess duties and to pay duties on imported mismarked goods).

### 2. The *Franchitti Court Correctly Addressed the Same Issue, Relying on* Victaulic *and* Pemco.

The *Franchitti* court addressed the same issue presented here in the context of nearly identical reverse-FCA claims against one of TCS's competitors, Cognizant. 555 F.Supp.3d at 69-71. Relator Franchitti alleged that the government was "deprived of application fees when Cognizant improperly applied for L-1 and

B-1 visas for work that required a more expensive H-1B visa." *Id.* at 67. Franchitti alleged that Cognizant "routinely applied for L-1 and B-1 visas instead of H-1B visas to save money and avoid the H-1B lottery process." *Id*. Franchitti alleged that Cognizant "issued fraudulent invitation letters attesting to the managerial and/or specialized duties the [L-1] visa recipients would perform – much of which was fabricated." *Id.* Once workers came to the U.S. on L-1 visas, "the work the employees actually performed did not meet the criteria for an L-1 visa." *Id.* Cognizant also "brought foreign workers to the U.S. on B-1 visas to perform billable work that required an H-1B visa." *Id.*

Cognizant argued—like TCS does here—that it had an "obligation" to pay visa application fees only for visas it applied for, even if the category of visa sought did not authorize the type of work that the employee performed. *Id.* at 70. The court rejected this narrow interpretation of "obligation" because it noted that the FCA definition of "obligation" focuses on "whether the defendant had a contractual, statutory or regulatory obligation." *Id.* (citing *Pemco*, 195 F.3d at 1234; *Victaulic*, 839 F.3d 242).

The *Franchitti* court relied heavily on *Pemco* and *Victaulic*. *Id*. at 70-71; see *also Franchitti II,* 2022 U.S. Dist. LEXIS 35486, at *5 ("both *Pemco* and *Victaulic* provide substantial precedent in support of the ruling").

29

In *Pemco*, whose interpretation of "obligation" was cited with approval by Congress when it passed the 2009 amendment defining "obligation," [2] defendant Pemco properly faced reverse-FCA liability because Pemco had decreased its obligation to pay money to the government by underrepresenting the value of surplus government airplane wings in Pemco's possession, inaccurately representing that they were an obsolete model. *Pemco*, 195 F.3d at 1235-36. The government accepted Pemco's offer to purchase the wings based on the $1,875 scrap value of obsolete wings. *Id.*

Pemco never offered to pay the over $2 million in market value for the wings. *Id*. Pemco's offer to purchase, even at the reduced value, "created only a contingent obligation to purchase—dependent on the government's inspection of the property and acceptance of Pemco's offer." *Id.* at 1237.

Pemco's "specific legal obligation" was not a "duty to pay" that it decreased through fraud—but rather, a regulatory and contractual duty to accurately inventory the equipment, and then follow the government's instructions for disposition of the wings, which could have been through purchase, return, donation, or destruction. *Id.* at 1235 n.1, 1237 (citing 48 C.F.R. § 45.603).

Like *Pemco*, TCS never offered to pay the value of the benefit it received. Rather, TCS obtained the benefit of more expensive H-1B visas by fraudulently

30

applying and paying for less expensive L-1 and B-1 visas. As in *Pemco*, because the regulatory scheme required higher payments for the benefits obtained, recovery under the FCA is appropriate. *Id.* at 1236-37.

In *Victaulic*, a relator brought a reverse-FCA claim against an importer of pipe fittings that had unlawfully imported goods with a mismarked country of origin and avoided ad valorem duties by falsifying entry documents. 839 F.3d at 245-46. Under U.S. law, it is illegal to import unmarked or mismarked articles, and if such goods are discovered by customs, the goods must be properly marked, re-exported, or destroyed. *Id.* at 254. If the mismarked goods escape detection and are released, the importer must pay a 10% ad valorem duty. *Id.* The district court denied the relator's motion to amend as futile for similar reasons as the district court's dismissal here: because "the duties were too attenuated and contingent to qualify as the type of obligations to pay money to the government covered by the FCA." *Id.* at 248. The *Victaulic* district court reasoned that "an importer does not owe marking duties upon importation of unmarked or mismarked merchandise" because "when mismarked or unmarked goods are in government custody the importer may not simply pay marking duties to obtain the release of such goods." *Id.* at 254. "Had Victaulic informed the government of this state of affairs, the goods would not have been allowed into the country." *Id.*

31

The Third Circuit reversed, finding that the district court relied on reasoning from *ATMI* that "has been called into doubt, if not entirely abrogated by the [2009] FERA" amendments, and that customs duties clearly constituted an "obligation" under the amended statute. *Id.* at 25455. The court observed that Victaulic had a statutory duty to disclose information necessary for CBP to properly assess customs duties, and that Victaulic had a duty to pay the marking duty at the time Victaulic imported the improperly marked goods without informing CBP of their non-conforming status. *Id.* As a policy matter, the court found that imposing FCA liability makes sense, as the government cannot inspect every shipment, and absent the threat of FCA treble damages liability importers may be incentivized not to disclose mismarked goods. *Id.* at 255-56.

The *Franchitti* court compared the relator's allegations to those approved by the courts in *Victaulic* and *Pemco*:

> Just as the defendant in *Pemco* submitted false records to pay less than the true value of the airplane equipment, Cognizant submitted false statements about the nature of its employees work to pay lower visa application fees. And, like the marking duty in *Victaulic*, Cognizant's obligation to pay the correct visa application fee accrued upon its submission of the visa application.

555 F.Supp.3d at 71. The court analogized the "USCIS regulatory scheme" for visas to the statute in *Victaulic* and to the regulation and pre-existing contract in

*Pemco*. *Id.* The common thread is that the regulations or contractual relationships at issue reflected the type of relationship between a private actor and the government that results in a duty to pay the government, regardless of whether the amount owed is yet fixed, but is distinct from a contingent monetary penalty for general wrongdoing. *Id.*

The *Franchitti* court concluded that a "plain language reading of the statute suggests that Cognizant had an obligation to pay the appropriate fee for the privileges associated with its desired visa[,]" based on either "an 'implied contractual' or 'fee-based' relationship under 31 U.S.C. § 3729(b)(3)." *Id.*

After its motion to dismiss was denied, Cognizant filed a motion for reconsideration. *Franchitti II,* 2022 U.S. Dist. LEXIS 35486, at *1-2. The court denied Cognizant's motion, reiterating that "Franch[i]tti sets forth a plausible claim by alleging that Cognizant fraudulently applied for less costly L-1 and B-1 visas where its foreign employees were required to obtain more expensive H-1B visas for the type of work they were undertaking." *Id.* at *3.

Here, the district court erroneously distinguished *Pemco* and *Victaulic*, and found *Franchitti* too "expansive" an approach. The district court took a "two wrongs make a right" approach by finding this matter distinguishable from *Pemco* and *Victaulic*. It reasoned that in *Pemco*, a written contract created a "specific legal

obligation to dispose of the property on the government's terms," and in *Victaulic* an importer obligation to pay a 10% marking fee was "deemed to 'have accrued at the time of importation' and [was] due and owing without exception. " However, according to the district court, here TCS had no reverse FCA obligation because "Tata's obligation to pay the H-1B visa fee did not accrue unless and until it applied for an H-1B visa. Having not done so, Tata is not responsible for a debt that it did not incur." ROA.254; RE at Tab 4, RE-31.

The district court's position, then, is that TCS's "wrong" of knowingly failing to apply for H-1B visas insulates TCS from its second "wrong" of obtaining the benefit of H-1B visas through requiring L-1 and B-1 visa workers to perform work that required an H-1B visa. ROA.71-72; RE at Tab 5, RE-25-26, ¶¶ 40, 44.

 At a fundamental level, TCS's actions are in line with matters (and those matters' policy considerations) that the district court sought to distinguish, such as *Conagra*, 465 F.3d at 1201-02 (finding FCA obligation to pay fees for replacement export certificates when it received the benefit of certificates even though it never applied for them); and *Pemco*, 195 F.3d at 1236 (finding FCA obligation to account for full value received even though defendant only offered to pay scrap value) that found an FCA obligation. Simply,  TCS was required to apply for H-1B visas and pay H-1B visa fees. 8 C.F.R. §§ 214.2(h)(2)(i)(E), (*l*)(7)(i)(C). Absent FCA

34

liability, TCS will not face any apparent repercussions for falsifying the visa applications at issue. 839 F.3d at 255-56.

### 3. *Visa Application Fees Are User Fees, Not Contingent Penalties.*

TCS has argued that its obligation to pay H-1B visa application fees was only a "potential" or "contingent" obligation—and therefore not actionable under § 3729(a)(1)(G)—because there is a competitive lottery process for H-1B visas, which means that it may not ever have been charged the H-1B visa application fee if it applied for the correct visa. District Court Dkt. 65 at 10-11. But some of the application fees are nonrefundable regardless of the lottery outcome. 8 C.F.R. § 103.2(a)(1) ("[Filing] fees generally are non-refundable regardless of [the outcome]"); 8 C.F.R. § 106.2(c)(11) (requiring $215 fee to register for the H-1B selection process); https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations/h-1b-electronic-registration-process) ("Required Fees: ... non-refundable H-1B registration fee").

Moreover, Conagra similarly argued that its obligation to pay for replacement certificates was "contingent"—like unassessed fines and penalties—because there were "additional stages" of the process before that fee became due, and the fee may never have become due, as USDA officials had discretion not to require a replacement certificate and therefore, not to charge a fee at all. *Conagra*,

465 F.3d at 1197, 1201, 1203. The *Conagra* court rejected this argument and distinguished the fee for a replacement export certificate from a contingent penalty for two reasons. First, the purpose of the fee for a replacement export certificate was akin to a "user fee" and was "not [a] penalt[y]." *Id.* at 1203. Second, "the need for some further governmental action or some further process to liquidate an obligation does not preclude a false claims action." *Id.* at 1204 (quoting DOJ amicus brief).

Similarly, in *Victaulic*, the mismarked or unmarked goods at issue would not have been allowed in the country if the government had been informed that they were mismarked or unmarked, and a customs duty would not have been owed. 839 F.3d at 254. The court nonetheless found an obligation to pay the customs duty. *Id.* at 254-55.

Here, the visa application fee is not a penalty, but a user fee.[1] TCS obtains the benefit of work that requires an H-1B visa and has a duty to pay the fee corresponding to that benefit, regardless of whether it filed an H-1B visa application. *See Conagra*, 465 F.3d at 1202-03 ("In our view, the circumstances are analogous to a motorist who attempts to avoid an annual fee by unlawfully altering the expiration date on a license plate. In that instance, it is not the altering of the plate

---

[1] Cf. 8 U.S.C. 1184(c)(9)(A), (11)(A) (imposing "fee" for H-1B visa applications).

that generates the fee but rather an independent event—the end of the yearly period."); *Franchitti II,* 2022 U.S. Dist. LEXIS 35486, at *3 (finding adequate claim where relator alleged that "[defendant's] foreign employees were required to obtain more expensive H-1B visas for the type of work they were undertaking"); 8 C.F.R. § 106.1(a) (requiring payment of appropriate fee to USCIS associated with the benefit or type of request); 8 C.F.R. § 214.2(h)(2)(i)(E) (requiring new or amended H-1B petition, with fee, after material changes); 8 C.F.R. § 214.2(*l*)(7)(i)(C) (requiring amended petition, with fee, after material changes for L-1 visa holder). TCS obtained the benefit of the H-1B user fee by having B-1 and L-1 visa holders perform work requiring an H-1B visa, and therefore owed the associated fees. *Conagra,* 465 F.3d at 1202-03; *Franchitti,* 555 F.Supp.3d at 71; 8 C.F.R. §§ 214.2(h)(2)(i)(E), (*l*)(7)(i)(C).

### 4.   *The Lesnik Decision Relied on an Abrogated Holding and Inapplicable Concessions.*

The district court found "support" for its decision in *Lesnik,* an out-of-circuit district court decision.

In *Lesnik,* the plaintiff argued that "[b]ecause Defendants falsely obtained cheaper [B-1] visas, they avoided an obligation to pay the government the higher fees associated with the more expensive unskilled-worker visa." 374 F.Supp.3d at 939 (N.D. Cal. Mar. 20, 2019). Relying primarily on *ATMI,* the *Lesnik* court found

that "because no petition-based visa application was made, there was no 'fixed sum that [was] immediately due,' which is a requirement of an obligation pursuant to [*ATMI*]." *Id.* at 940.

But relying on *Lesnik* and its progeny was erroneous for at least three reasons. First, *Lesnik* relied on an abrogated interpretation of "obligation," relying on *ATMI* for the proposition that an FCA obligation "must be for a fixed sum that is immediately due." *Id.* (quoting *ATMI*, 190 F.3d. at 735). Congress amended the definition of "obligation" in 2009 specifically to invalidate *ATMI*'s holding. *Victaulic,* 839 F.3d at 253 (discussing *ATMI*). The *Lesnik* court directly relied on that abrogated interpretation, incorrectly concluding that: a "'fixed sum that [was] immediately due,' … is a requirement of an obligation pursuant to [*ATMI*]." 374 F.Supp.3d at 940 (quoting *ATMI,* 190 F.3d at 735). *But see* 31 U.S.C. § 3729(b)(3) (defining obligation to include "an established duty, *whether or not fixed*….") (emphasis added).[4]

Second, *Lesnik* relied on "strange" concessions from plaintiffs unique to that case. *Lesnik*, 374 F.Supp.3d at 940 (observing that "[s]trangely, Plaintiffs seem to agree with Moving Defendants' argument"; plaintiffs conceded that "'[a]n employer is obligated to pay fees *when applying* for petition based visas.'").

Third, the better-reasoned *Franchitti* court declined to follow *Lesnik*, explaining that *Lesnik* was not controlling and "the rationales of *Pemco* and *Victaulic* were more compatible with a plain reading of the FCA." *Franchitti II*, 2022 U.S. Dist. LEXIS 35486, at *5.

Thus, Palmer adequately alleged an FCA obligation, and the dismissal of Palmer's reverse-FCA claim should be vacated and remanded.

## CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, the district court wrongly dismissed Palmer's reverse FCA claim, because Palmer's First Amended Complaint adequately alleged: (1) an FCA "obligation" in support of his claim based on (a) TCS's duty to pay higher withholding taxes as part of the H-1B wage requirement, and (b) TCS's duty to apply and pay application fees for H-1B visas where its visa employees performed work requiring H-1B visas.

WHEREFORE, Appellant Palmer requests this Court reverse the District Court's May 21, 2025 Opinion and Order granting Appellee's Motion to Dismiss, remand this action for additional proceedings consistent therewith, and grant Palmer such further relief to which he is entitled.

Respectfully submitted,

*/s/Mark D. Cronenwett*
Mark D. Cronenwett
Texas Bar No. 00787303
Lewis Brisbois Bisgaard & Smith, LLP
mark.cronenwett@lewisbrisbois.com
2100 Ross Ave., Ste. 2000
Dallas, TX 75202
(214) 722-7100

Counsel for Appellant Jack "Jay" Palmer

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on September 19, 2025, on the following counsel of record for Appellee Tata Consulting Services:

Howard Shapiro
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
212-295-6706
howard.shapiro@wilmerhale.com

Daniel Volchok
Wilmer Cutler Pickering Hale & Dorr, L.L.P.
2100 Pennsylvania Avenue, N.W.
Washington, DC 20037
202-663-6103
daniel.volchok@wilmerhale.com

Lauren Moore
Wilmer Cutler Pickering Hale & Dorr, L.L.P.
2100 Pennsylvania Avenue, N.W.
Washington, DC 20037
202-663-6160
lauren.moore@wilmerhale.com

Melissa Richards Smith
Gillam & Smith, LLP
303 South Washington Avenue
Marshall, TX 75670
903-934-8450
melissa@gillamsmithlaw.com

*/s/Mark D. Cronenwett*
Mark D. Cronenwett

## CERTIFICATE OF COMPLIANCE

1.   This brief complies with the type-volume limitation of FED R. APP. P. 32(A)(7)(B) because:

   • this brief contains 8,789 words, excluding the parts of the brief exempted by FED. R. APP. 32(f).

2.   This brief also complies with the typeface requirements of FED. R. APP. P. 32(A)(5) and the type requirements of FED. R. APP. P. 32 (A)(6) because:

   • this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with a 14 point named Times New Roman.

*/s/Mark D. Cronenwett*
Mark D. Cronenwett

Dated: September 18, 2025

41